109 F.3d 756
 65 USLW 2680, 42 U.S.P.Q.2d 1220
 HOECHST-ROUSSEL PHARMACEUTICALS, INC., Plaintiff-Appellant,
v.
Bruce A. LEHMAN, Assistant Secretary of Commerce and
Commissioner of Patents and Trademarks, Defendant-Appellee,
and
William K. Summers, Defendant-Appellee.
 No. 96-1104.
 United States Court of Appeals,
Federal Circuit.
 March 28, 1997.
Rehearing Denied; Suggestion for Rehearing In Banc
Declined June 5, 1997.
 
 Kenneth B. Herman, Fish & Neave, of New York City, argued, for Plaintiff-Appellant. With him on the brief were Herbert F. Schwartz, Marta E. Gross, and William L. Leschensky.
 Howard S. Scher, Attorney, Appellate Staff, Civil Division, Department of Justice, Washington, DC, argued, for Defendant-Appellee Bruce A. Lehman. Counsel on the brief were Frank W. Hunger, Assistant Attorney General, Douglas N. Letter, Attorney, and Sean A. Lev, Attorney. Also on the brief were Nancy J. Linck, Solicitor, Albin F. Drost, Deputy Solicitor, and Scott A. Chambers, Associate Solicitor, Department of Commerce, Patent & Trademark Office, Arlington, VA.
 Before NEWMAN, MAYER, and CLEVENGER, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 Hoechst-Roussel Pharmaceuticals, Inc. (Hoechst) appeals the decision of the United States District Court for the Eastern District of Virginia, No. 95-CV-650 (October 27, 1995), granting summary judgment to Bruce A. Lehman, the Commissioner of Patents and Trademarks (the Commissioner), that Hoechst is not entitled to extend the term of its United States Patent No. 4,631,286 under 35 U.S.C. § 156 (1994). We affirm on the basis that Hoechst's patent does not claim either the drug product which received regulatory approval or its use.
 
 
 2
 * On June 4, 1990, Warner-Lambert Company (Warner-Lambert), which is not a party to this case, submitted a new drug application to the Food and Drug Administration (FDA) for approval to market the drug COGNEX TM to treat Alzheimer's disease. The active ingredient in COGNEX TM is tacrine hydrochloride. On September 9, 1993, the FDA granted Warner-Lambert approval to market COGNEX TM.
 
 
 3
 On September 30, 1993, Hoechst sued Warner-Lambert for infringement of its United States Patent No. 4,631,286 (the '286 patent) which issued on December 23, 1986. The '286 patent does not claim tacrine hydrochloride; rather, it discloses and claims both the compound 1-hydroxy-tacrine and a method of treating a patient in need of memory enhancement by administering an effective amount of 1-hydroxy-tacrine.[1] Tacrine hydrochloride, after ingestion, metabolizes into 1-hydroxy-tacrine and other compounds. On October 5, 1994, the court entered a consent judgment in which Warner-Lambert admitted that tacrine hydrochloride infringes certain claims of the '286 patent.
 
 
 4
 While it was litigating against Warner-Lambert, Hoechst also filed with the United States Patent and Trademark Office (PTO) an application for extension of the term of the '286 patent, pursuant to 35 U.S.C. § 156, based on the regulatory review period for COGNEX TM. On April 3, 1995, the Commissioner denied Hoechst's application for patent term extension. The Commissioner decided that Hoechst was not a proper applicant for term extension because Hoechst was not involved, either directly or indirectly, in the regulatory approval process for tacrine hydrochloride. In addition, the Commissioner determined that Hoechst's patent term should not be extended because the '286 patent does not claim tacrine hydrochloride, as required by the statute.
 
 
 5
 Hoechst appealed the Commissioner's decision in the district court. After both parties moved for summary judgment, the district court granted the Commissioner's motion and held that Hoechst was not entitled to a patent term extension. The district court agreed with the Commissioner that Hoechst was not a proper applicant for extension, and that the '286 patent does not claim tacrine hydrochloride. Hoechst appeals the district court's decision, which we have jurisdiction to review pursuant to 28 U.S.C. § 1295(a)(1) (1994).
 
 II
 
 6
 Title 35, section 156, entitled "Extension of patent term," recites, in relevant part:
 
 
 7
 (a) The term of a patent which claims a product, a method of using a product, or a method of manufacturing a product shall be extended in accordance with this section from the original expiration date of the patent if ...
 
 
 8
 (4) the product has been subject to a regulatory review period before its commercial marketing or use.
 
 
 9
 35 U.S.C. § 156(a) (1994) (emphasis added).
 
 
 10
 The Commissioner contends that Hoechst is not entitled to have the term of the '286 patent extended because that patent does not "claim" either the product that received FDA approval (tacrine hydrochloride) or a method of using that product. Hoechst responds that a patent "claims" an FDA-approved product, within the meaning of that term as employed in the statute, if the FDA-approved product would infringe a claim of that patent. Because use of tacrine hydrochloride allegedly infringes its claim to a method of using 1-hydroxy-tacrine, Hoechst contends that the '286 patent "claims" a method of using tacrine hydrochloride.
 
 
 11
 The district court agreed with the Commissioner's interpretation of the term "claims" and granted the Commissioner's motion for summary judgment. We review the district court's grant of summary judgment to ensure that the standards of Fed.R.Civ.P. 56(c) have been met. Glaxo Operations UK Ltd. v. Quigg, 894 F.2d 392, 395, 13 USPQ2d 1628, 1630 (Fed.Cir.1990). Because the parties do not dispute any issues of fact, we are left with the legal question involving the meaning of the statutory term "claims," which we decide with independence from the trial court's interpretation. See Merck & Co. v. Kessler, 80 F.3d 1543, 1549, 38 USPQ2d 1347, 1351 (Fed.Cir.1996).
 
 III
 
 12
 We begin our task of statutory interpretation by examining the text of the statute. In so doing, we must interpret statutory words as taking their ordinary, common meaning unless otherwise defined by Congress. Glaxo, 894 F.2d at 395, 13 USPQ2d at 1630.
 
 
 13
 As explained above, the text of section 156 states in relevant part, "[t]he term of a patent which claims a product, a method of using a product, or a method of manufacturing a product shall be extended...." The term "claims" has been used in patent legislation since the Patent Act of 1836 to define the invention that an applicant believes is patentable. See Act of July 4, 1836, ch. 357, § 6, 5 Stat. 117. Since that time, the term has represented that portion of the specification that defines the patent owner's property rights in the invention. See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 1257-58, 9 USPQ2d 1962, 1966-67 (Fed.Cir.1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention."). Accordingly, the current patent statutes require that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 (1994). In addition, in order for a patent to "claim" a product, the patentee must have satisfied numerous tests of patentability, including, inter alia, disclosure of the best mode of making the claimed product, and a description which would enable a person skilled in the art to make and use the claimed invention.[2] See id.
 
 
 14
 This concept of a claim is related to, but distinct from, the concept of infringement. Direct infringement consists of making, using, offering to sell, or selling the invention defined by the claims of a patent, without the authority of the patent owner. See 35 U.S.C. § 271. With respect to direct infringement, then, the claims define the patent owner's property rights whereas infringement is the act of trespassing upon those rights. The relationship between infringement and the claims becomes even more tenuous under the doctrine of equivalents, where a product is deemed to infringe the patentee's right to exclude even though the product does not fall within the scope of the patent's claims. See Wilson Sporting Goods Co. v. David Geoffrey & Assocs., 904 F.2d 677, 684, 14 USPQ2d 1942, 1948 (Fed.Cir.1990). In sum, the concept of a "claim" is different from the concept of infringement, and, as a result, the plain meaning of "claims" is not the same as the plain meaning of infringement.
 
 
 15
 As applied to the present case, this plain meaning of the term "claims" supports the Commissioner's argument. In the '286 patent, Hoechst has not claimed either the active ingredient that received FDA approval, tacrine hydrochloride, or a method of using that ingredient.[3] Instead, Hoechst has claimed the chemically distinct product 1-hydroxy-tacrine and the method of using that product. Admittedly, Hoechst may be entitled to exclude others from administering tacrine hydrochloride to patients. But this right to exclude would not arise from the fact that Hoechst has claimed tacrine hydrochloride; nor would it arise from the fact that COGNEX TM contains the product claimed by Hoechst, 1-hydroxy-tacrine. Instead, the right to exclude may arise from the fact that when administered, tacrine hydrochloride metabolizes into another product, 1-hydroxy-tacrine, which Hoechst has claimed.[4] See Zenith Labs. v. Bristol-Myers Squibb, 19 F.3d 1418, 1422, 30 USPQ2d 1285, 1288 (Fed.Cir.1994) (infringement may occur if the administered product is converted in vivo into the claimed product). Therefore, we agree with the Commissioner that Hoechst's '286 patent does not "claim," within the ordinary meaning of that term, either the product tacrine hydrochloride or a method of using that product.
 
 IV
 
 16
 Faced with the settled ordinary meaning of the term "claims," Hoechst argues that Congress did not employ the term with that meaning. Hoechst argues that the legislative history of section 156 instead reveals that Congress intended to include any patent that has claims that are infringed by the making, using, or selling of an FDA-approved product.
 
 
 17
 "When ... the terms of a statute [are] unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances." Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). Although the plain meaning of "claims" would appear to resolve the case, we examine the legislative history to ensure that there exists no clearly expressed legislative intention contrary to the statutory language. See Glaxo, 894 F.2d at 395, 13 USPQ2d at 1630-31. Given the existence of a plain meaning, Hoechst "must provide an 'extraordinary showing of contrary intentions.' " See id. (quoting Garcia v. United States, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984)). We conclude that Hoechst has not made a sufficiently strong showing to warrant a deviation from the term's plain meaning.
 
 
 18
 Hoechst relies on two items of legislative history in support of its argument. First, the legislative history states that "[t]he term 'claims' was selected because it is the term used in the patent law to describe the invention which the patent owner or its assignee may prevent others from making, using or selling during the seventeen year term of the patent...." H.R.Rep. No. 857, pt. I, 98th Cong., 2d Sess. 37 (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2670. This segment of legislative history, however, does not contradict the plain meaning of the term "claims," as defined above. If anything, it supports the notion that the claims define the scope of the property rights in the invention. Moreover, it indicates that Congress deliberately chose the term "claims" because it already had a well-known meaning and usage in the patent law.
 
 
 19
 The second piece of legislative history that Hoechst relies upon recites that "[t]he policy which the Committee seeks to implement ... is, in brief, that the first patent ... which claims the approved product, in the sense that the approved product would infringe a claim of that patent ... is the patent which should be rewarded with an extension...." H.R.Rep. No. 857 at 38, reprinted in 1984 U.S.C.C.A.N. at 2670. Hoechst contends that this statement makes clear that by employing the term "claims," Congress intended only that the approved product infringe a claim of the patent.
 
 
 20
 This portion of the legislative history, indeed, provides some suggestion that Congress may have intended the term "claims" to simply require that the FDA-approved product infringe the patent's claims. It does not, however, rise to the level of a "clearly expressed legislative intention contrary to the statutory language." Madison Galleries, Ltd. v. United States, 870 F.2d 627, 629 (Fed.Cir.1989).
 
 
 21
 Given that Congress employed both the term "claims" and the term "infringement" in this piece of legislative history, we would expect Congress to employ the term "infringement" somewhere in the patent term extension statute if it intended Hoechst's interpretation. Instead, section 156 consistently employs the term "claim" (or "claims"), see § 156(d)(1)(B) (directing the patent owner to identify "each claim of such patent which claims the approved product or a method of using or manufacturing the approved product" (emphasis added)); § 156(b) (describing the rights granted in terms of the type of claims involved), and there exists a notable absence of any reference to infringement. We must assume that the usage employed by Congress is deliberate, in view of the fact that Congress used the term infringement in other sections of the act. For example, Congress used the term "infringement" in section 271 to define certain acts of infringement, and to excuse other acts of infringement which are conducted solely for the purposes of obtaining FDA approval. See 35 U.S.C. §§ 271(e)(1)-(2).
 
 
 22
 Moreover, given the distinction between a "claim" and its infringement, had Congress intended the usage urged by Hoechst, it could have drafted section 156(a) to make that intention more clear than appears from the language actually chosen. For example, Congress could have drafted § 156 to recite: "The term of a patent which claims a product, a method of using a product, or a method of manufacturing a product which claim is infringed by an FDA-approved product, use of an FDA-approved product, or manufacture of an FDA-approved product shall be extended...." Such a statute would clearly indicate that the patent need not claim the FDA-approved product or a method of using an FDA-approved product; rather, it need only claim a product or method of using that product, so long as that claim is infringed by the FDA-approved product or its use. Congress, however, did not choose to do so. Instead, Congress chose to require that the patent, itself, claim the FDA-approved product or its use. See §§ 156(a), (f)(1)(A), (f)(2)(A).
 
 
 23
 In sum, because the evidence cited by Hoechst does not amount to an extraordinary showing that Congress intended the term "claims" to have anything other than its plain meaning, we conclude that the term should be given its ordinary meaning from the patent law.[5]
 
 V
 
 24
 Hoechst's '286 patent neither claims tacrine hydrochloride nor a method of using that product. Therefore, the district court's judgment that Hoechst is not entitled to have the term of the '286 patent extended is
 
 
 25
 AFFIRMED.
 
 
 26
 No costs.
 
 
 27
 PAULINE NEWMAN, Circuit Judge, concurring in the judgment.
 
 
 28
 I conclude that Hoechst-Roussel is not entitled to extension of the term of the '286 patent on the facts of this case, but my decision is based on different grounds from that of the panel majority. I can not agree that what is claimed and what is infringed must be interpreted differently for 35 U.S.C. § 156 than for any other provision of Title 35. In addition, the incorrect rulings concerning who is entitled to patent term extension should not be tacitly endorsed by the silence of the Federal Circuit.
 
 
 29
 * The district court held that "a patent holder not attempting to market a product was not an intended beneficiary of § 156" and that Hoechst-Roussel, not having itself sought regulatory market approval, could not apply for extension of the term of the '286 patent. That holding is too broad, for § 156 is satisfied if the holder of the regulatory market approval acts as the agent of the patentee in applying for extension of the patent term; it is the holder of the market approval that is the primary intended beneficiary of § 156. In addition, it is incorrect to hold or imply that the applicant for market approval must have been the patentee or its agent at the time the approval was sought.
 
 
 30
 The purpose of the Patent Term Restoration Act is to strengthen the patent-based incentive to the commitment of financial resources to medicinal product development and marketing. Section 156 does not turn on whether the patent is owned by the entity that is marketing the product, or is merely licensed to that entity. However, neither is there an automatic right to term extension when the patentee does not itself participate in the FDA market approval process; all of the provisions of § 156 must be met. In the case at bar the statutory provisions were not met. On this ground, I concur in the judgment denying the extension.
 
 
 31
 * Section 156 requires that the application for term extension be submitted by the patent owner "or its agent":
 
 
 32
 (a) The term of a patent which claims a product, a method of using a product, or a method of manufacturing a product shall be extended in accordance with this section from the original expiration date of the patent if
 
 
 33
 . . . . .
 
 
 34
 (3) an application for extension is submitted by the owner of record of the patent or its agent and in accordance with the requirements of paragraphs (1) through (4) of subsection (d);
 
 
 35
 35 U.S.C. § 156(a)(3). When the patentee itself does not meet the requirements of § 156, the entity that is seeking regulatory market approval can act as the agent of the patentee for the purpose of applying for patent term extension. In this way the statute accommodates the situation of a patentee that does not itself market the product, but whose patent supports the commercial development and regulatory compliance activity.
 
 
 36
 Throughout § 156 is iterated the usage whereby the entity engaged in the regulatory review process is deemed the agent of the patentee in applying for the patent term extension. In that context the marketing entity provides the data concerning the development activities necessary to support the application for extension. For example, § 156(d)(1)(D) requires that the applicant for extension provide a description of its activities during the regulatory review period and the dates of such activities; this description may be provided by the marketing entity when the patentee has not itself engaged in such activities. Section § 156(c)(1) provides that the term of the extension is reduced by any period "during which the applicant for the patent extension did not act with due diligence during such period of the regulatory review period," thus recognizing that the due diligence of the marketing entity, as applicant for extension, is what is relevant for purposes of calculating the term. Further, the provision for interim extensions, § 156(d)(5)(A), states that an application for interim extension may be filed if "the owner of record of the patent or its agent reasonably expects that the applicable regulatory review period ... may extend beyond the expiration of the patent term." Again, the statute recognizes that the patent owner may not have the information on which to base an expectation concerning the length of the regulatory review period, but that the participant in the regulatory review would have the reasonable expectation required by this provision, and would provide this information as agent of the patent owner.
 
 
 37
 Hoechst-Roussel argues that it is entitled to apply for and receive the patent term extension without participation of the holder of the marketing approval, citing the FDA regulation that "the actions of the marketing applicant shall be imputed to the applicant for patent term restoration." 21 C.F.R. § 60.36(b). Hoechst-Roussel states that this imputed benefit removes the need for participation of the marketing entity. In its application for extension Hoechst-Roussel referred to Warner Lambert's due diligence and regulatory approval activities "on information and belief," as purported compliance with § 156(f)(1)(D) and (c)(1). Although FDA regulation § 60.36(b) implements the statutory provisions that accommodate a variety of relationships between patentee and marketing applicant, it does not override the requirement for compliance with all of the provisions of § 156. In this case the requirements were not met, for the participation of the marketing applicant as the agent of the patentee in securing the extension was necessary in order to describe pre-market activities, to establish diligence, and otherwise to comply with § 156.
 
 
 38
 Hoechst-Roussel raises several additional arguments for asserting entitlement to extension of the '286 patent term despite the non-participation of the marketing applicant. Hoechst-Roussel states that since the '286 patent was the first patent to issue with respect to Warner Lambert's FDA-approved product, and Warner Lambert has not authorized any other patentee to rely on the regulatory approval that it obtained, the '286 patent is the only patent that can be extended. Hoechst-Roussel cites 37 C.F.R. § 1.785(c)[1] which provides:
 
 
 39
 (c) If an application for extension is filed which seeks the extension of the term of a patent based upon the same regulatory review period as that relied upon in one or more applications for extension pursuant to the requirements of this subpart, the certificate of extension of patent term will be issued on the application only if--
 
 
 40
 ....
 
 
 41
 * * *(3) The holder of the regulatory approval granted with respect to the regulatory review period is not an applicant and no applicant for extension holds an express and exclusive authorization from the holder of the regulatory approval to rely upon the regulatory review period as the basis for the application for extension and the application is for extension of the patent having the earliest date of issuance of those patents for which extension is sought based upon the same regulatory review period.
 
 
 42
 Although the parties discuss the potential extension of Dr. Summers' later-issued patent, the status of that patent and the applicability of § 1.785(c) were not decided by the district court, and are not before us. In all events, § 1.785(c) does not authorize extension solely on the ground of being first; all of the statutory requirements must be met.
 
 
 43
 Hoechst-Roussel also refers to the lost income to a non-marketing patentee who can not sue the marketing applicant for infringement during the regulatory review period, citing 35 U.S.C. § 271(e) (overruling Roche Products, Inc. v. Bolar Pharmaceutical Co., 733 F.2d 858, 221 USPQ 937 (Fed.Cir.), cert. denied, 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117 (1984)). Section 271(e) permits premarket approval activity conducted for the sole purpose of sales after patent expiration. I discern no legislative intent specifically to benefit a non-marketing patentee on this ground.
 
 
 44
 Hoechst-Roussel also argues that support for research investment is part of the policy consideration for patent term extension. Although research expenditures are not irrelevant, the history of the extraordinary step of extending the patent term for pharmaceutical products shows that its target was the time consumed by and the high cost of development and regulatory approval. Although the initial discovery of a new medicinal product or use often derives from extensive and costly research, such research precedes filing the patent application and thus does not consume the patent's life. Undoubtedly investment in research by commercial entities such as Hoechst-Roussel is motivated by the potential for economic benefit. However, the legislative history makes clear that the purpose of patent term restoration is to compensate for the years of development before commercial sale is authorized, and that the incentive to conduct the initial research is viewed in this broader context.
 
 B
 
 45
 Thus the district court erred in denying Hoechst-Roussel's application simply because Hoechst-Roussel was not marketing the product. To satisfy the statute when the patentee is not the holder of the market approval, the market approval entity acts as the agent of the patentee in applying for the extension and meeting the other statutory requirements such as due diligence. The litigation settlement license from Hoechst-Roussel to Warner Lambert did not eliminate the need for compliance with the statutory requirements. And while the PTO was on the right track when it required a relationship, such as a license, between the patent owner and the holder of the FDA approval, the PTO was incorrect in arguing that the relationship must have existed when the marketing efforts began.
 
 
 46
 Since Hoechst-Roussel did not meet the requirements of § 156, I would affirm the judgment denying the application for extension of the '286 patent term.
 
 II
 
 47
 Turning to the ground on which the panel majority decided the appeal, I do not share their view that even though the '286 patent claims cover and would be infringed by use of the FDA-approved product, the requirements of 35 U.S.C. § 156 are not met. The approved product is converted into the claimed product in vivo; thus infringement occurs upon use of the approved product. There is no basis in the law for restricting § 156 to exclude this circumstance. The '286 patent, which claims hydroxy-tacrine, is not barred from extension simply because the registered product, tacrine hydrochloride, forms hydroxy-tacrine only in vivo. The conversion to hydroxy-tacrine was established before the FDA, and infringement of the '286 claims was conceded. The statutory requirements for this aspect of extension of the '286 patent were met.
 
 
 48
 The panel majority states that "the concept of a 'claim' is different from the concept of infringement, and, as a result, the plain meaning of 'claims' is not the same as the plain meaning of infringement." Majority op. at 6. The words are indeed different, and the distinctions are relevant in appropriate contexts.[2] However, as applied to § 156, the legislative history makes quite clear that the term "claims" is used in the statute because it describes the protected subject matter of the patent:
 
 
 49
 The term "claims" was selected because it is the term used in the patent law to describe the invention which the patent owner or its assignee may prevent others from making, using or selling during the seventeen year term of the patent....
 
 
 50
 H.R.Rep. No. 98-857, Part I at 37 (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2670 (emphasis added). The Report also states:
 
 
 51
 The policy which the Committee seeks to implement in paragraph (4)(A) is, in brief, that the first patent (1) which claims the approved product, in the sense that the approved product would infringe a claim of that patent ... is the patent which should be rewarded with an extension.
 
 
 52
 H.R.Rep. No. 98-857 at 38, reprinted in 1984 U.S.C.C.A.N. at 2671 (emphasis added). It is thus explained that the word "claims" was "selected" for the text of § 156 because the claims define what is infringed.
 
 
 53
 The purpose of § 156 is to extend the time during which the patent can be enforced against infringers, for a patent whose claims would be infringed by the FDA-approved product. Extending the period of enforcement against infringement is the way in which this legislation fulfills its purpose. The word "claim" is used in the statute for the purpose of implementing this purpose, not to provide a loophole when the claim would be directly infringed only upon use of the FDA-approved product. It is incorrect, and contrary to the purpose of the Patent Term Restoration Act, for this court now to create that loophole.
 
 
 54
 The panel majority states that the relationship between any claim and infringement is "tenuous." Majority op. at 6. It is not tenuous; it is the core of the patent system. Section 156 does not require creation of a new, vague, and unnecessary distinction between what is claimed and what is infringed, unique to this section of Title 35. The FDA, the agency assigned responsibility for informing the PTO whether a particular product is covered by the patent for which extension is sought, so informed the PTO with respect to the '286 patent and "Cognex." It is not disputed that tacrine hydrochloride is converted in vivo to the hydroxy-tacrine of the '286 claims. This metabolic path was established before the FDA. As explained in Zenith Labs., Inc. v. Bristol-Myers Squibb Co., 19 F.3d 1418, 1422, 30 USPQ2d 1285, 1288 (Fed.Cir.1994), in vivo conversion into the drug named in the claims is direct infringement. Since the registered product would directly infringe the claims during use, the product is covered by the claims and qualifies the claims for extension.
 
 
 55
 The distinction drawn by the panel majority leads to the curious result that the '286 claims would be infringed for all purposes of Title 35 except for § 156. This result is not supported by the law of claiming, of infringement, or of term extension. Thus I must, respectfully, disagree with the panel majority's decision on this ground.
 
 
 
 [1]
 Tacrine hydrochloride is claimed in United States Patent No. 4,816,456, held by Dr. William Summers. Dr. Summers, an intervenor in this case, also seeks to extend the term of his patent based on the FDA's approval of COGNEX TM. Dr. Summers's application for term extension is pending before the Commissioner
 
 
 [2]
 These same requirements, of course, also apply to process patents
 
 
 [3]
 The statute defines "product" to include a "drug product," 35 U.S.C. § 156(f)(1), which, in turn, is defined as the active ingredient of a drug that receives FDA approval, 35 U.S.C. § 156(f)(2)(A). For purposes of patent term extension, this active ingredient must be present in the drug product when administered. See Glaxo Operations UK Ltd. v. Quigg, 706 F.Supp. 1224, 1227-28, 10 USPQ2d 1100, 1103 (E.D.Va.1989), aff'd 894 F.2d 392, 13 USPQ2d 1628 (Fed.Cir.1990). Although the term "product" in the statute includes any salt or ester of the active ingredient of a drug that receives FDA approval, 1-hydroxy-tacrine is neither a salt nor an ester of tacrine hydrochloride
 
 
 [4]
 Hoechst contends that although it does not claim the product tacrine hydrochloride, it based its application for patent term extension on its claims covering a method of using tacrine hydrochloride. We fail to see how this advances Hoechst's case. Section 156 allows the Commissioner to extend the term of a patent that claims a method of using an FDA-approved product. In the present case, this would include patents that claim a method of using tacrine hydrochloride. Hoechst's '286 patent, however, claims a method of using 1-hydroxy-tacrine rather than a method of using tacrine hydrochloride. Ultimately, the problem for Hoechst is the same for both its product and method claims: its patent claims relate to 1-hydroxy-tacrine rather than tacrine hydrochloride
 
 
 [5]
 The parties also dispute whether Hoechst is a proper applicant for patent term extension. The Commissioner argues that Hoechst is not because Hoechst did not participate in the FDA approval process, either directly or indirectly. Hoechst contends that the statute requires neither participation by the patentee in the regulatory process, nor any special relationship between the patentee and the party receiving regulatory approval. We do not reach this issue, however, in light of our conclusion that Hoechst has claimed neither the product receiving FDA approval nor its use
 
 
 [1]
 We are advised that the PTO has changed these regulations. Only the regulations in effect during the relevant period have been considered
 
 
 [2]
 For example, the distinction between what is claimed and what is infringed is manifest in the circumstance of infringement by equivalents, when a patent is infringed by something that is not claimed; and there may be infringement liability for inducement or contributory infringement. It is not before us to decide whether § 156 authorizes extension of the term of a patent that is infringed under the doctrine of equivalents or as a matter of contributory or induced infringement, for the '286 claims are literally and directly infringed when tacrine hydrochloride is ingested