**The ARNOLD PARTNERSHIP, Plaintiff,**

**v.**

**James E. ROGAN, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, and Nicholas P. Godici, Commissioner for Patents, United States Patent and Trademark Office, Defendants.**

No. CIV.A. 02–858–A.

United States District Court, E.D. Virginia, Alexandria Division.

Feb. 20, 2003.

Anna Phipps Engh, Esq., Covington & Burling, Washington, DC, for Plaintiff.

Dennis E. Szybala, AUSA, Richard Parker, AUSA, United States Attorney's Office, Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

Before us are cross-motions for summary judgment filed by plaintiff The Arnold Partnership and defendants James E. Rogan and Nicholas P. Godici, collectively representing the United States Patent and Trademark Office (the "USPTO"). Plaintiff seeks a reversal of the USPTO's decision denying plaintiff's application for a

term extension of U.S. Patent 4,587,252, (the "'252 patent"), the commercial embodiment of which is its drug Vicoprofen. The USPTO denied the application after determining that plaintiff's patent did not qualify for an extension under Title II of the Drug Price Competition and Patent Restoration Act of 1984, 35 U.S.C. § 156 (the "Act"), which authorizes term extension for patents covering a limited class of drugs. Defendants ask us to affirm the USPTO's decision under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA").

No material facts are in dispute; the only issue is whether the USPTO properly denied plaintiff's application. To resolve this issue, we must determine whether the USPTO has correctly interpreted § 156. Because we find that the USPTO's interpretation of § 156 is consistent with the statute's plain meaning and, therefore, with the intent of Congress in passing the Act, we will grant summary judgment in favor of defendants.

*I. Background*

Plaintiff is the current owner of the '252 patent, which issued on May 8, 1986. The '252 patent claims "[a] pharmaceutical composition which comprises hydrocodone or a pharmaceutically acceptable acid addition salt thereof and ibuprofen or a

pharmaceutically acceptable acid addition salt thereof," as well as various processes for treating pain in mammals by administering this composition. Pl.'s Compl. for Declaratory J. and Injunctive Relief Ex. 2. Vicoprofen, the commercial embodiment of the invention claimed in the '252 patent, was the first commercial composition drug approved by the United States Food and Drug Administration (the "FDA") that contained a combination of the active ingredients ibuprofen and hydrocodone bitartrate, the salt form of the active ingredient hydrocodone.[1] Both hydrocodone bitartrate and ibuprofen previously had been marketed as separate drugs.

The '252 patent expires on December 18, 2004. On November 20, 1997, plaintiff filed with the USPTO an application for patent term extension under 35 U.S.C. § 156.[2] The USPTO denied the application on November 20, 2001, finding that it failed to satisfy the "first commercial marketing" requirement of § 156(a)(5)(A) because both hydrocodone bitartrate and ibuprofen had previously been approved by the FDA for commercial marketing and use. The USPTO's decision was consistent with the combination drug policy it had followed since at least 1989. Under that policy, to qualify for patent term extension under § 156(a)(5)(A), a patent covering a drug composed of multiple active ingredients must claim at least one active

---

1. Hydrocodone bitartrate is a cough suppressant, while ibuprofen is a pain reliever. PHYSICIANS DESK REFERENCE GENERICS 1441, 1489 (1st ed.1995). In plaintiff's application for extension of the '252 patent, which comprises a binding part of the administrative record below, plaintiff clearly identified hydrocodone bitartrate and ibuprofen as discrete active ingredients. Aff. of Joseph E. Topmiller, Esq. in Supp. of Pl.'s Mot. for Summ. J. and Opp. to Def.'s Mot. for Summ. J. at A36, A38. In its pleadings, however, plaintiff characterizes these chemicals as the "therapeutic agents" of Vicoprofen. Plaintiff is bound by its admissions in the administrative process, and more-

over, there is no legal significance to the term "therapeutic agent." *See, e.g., Glaxo Operations UK Ltd. v. Quigg,* 706 F.Supp. 1224, 1225 (E.D.Va.1989) (identifying the active ingredient of a particular drug as its "therapeutically active and effective" pharmaceutical compound).

2. Under the Act, the term of a patent covering an "approved product" may be extended up to five years, with the length of the extension determined in part by the length of the regulatory review period for that product. 35 U.S.C. § 156(c), (g)(6)(A).

ingredient that has not previously been approved for commercial marketing or use. *In re Alcon Laboratories Inc.*, 1989 WL 274404, 13 U.S.P.Q.2d 1115, 1118 (Comm'r Pat. & Trademarks Sept. 1, 1989) ("For a product which contains a plurality of active ingredients ... [§ 156] must be analyzed with respect to each active ingredient."); *see also In re Astra Lakemedel Aktiebolag*, slip op. at 7 (Comm'r Dec. Mar. 3, 1994) (denying term extension of a drug patent under § 156 because the FDA had previously approved each of the drug's two active ingredients for commercial marketing and use).

Plaintiff timely filed suit in this court under the APA, challenging the USPTO's denial of its application for a term extension of the '252 patent. We find that subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (relating to patents), and that the question of whether the USPTO properly denied plaintiff's application is ripe for resolution.

## II. Standard of Review

■ Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Ray v. Lehman*, 55 F.3d 606, 608 (Fed.Cir.1995). Under the APA, we may reverse the USPTO's final decision denying plaintiff's application for an extension of the '252 patent's term only if we determine that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Ray*, 55 F.3d at 608. Any deference we owe to the USPTO's decision arises not from force of law but rather from "the thoroughness of its consideration and the validity of its reasoning, *i.e.*, its basic power to persuade." *Merck & Co., Inc. v. Kessler*, 80 F.3d 1543, 1550 (Fed.Cir.1996) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

## III. Discussion

Under § 156, a patent qualifies for term extension if all of five requirements are satisfied:

(1) the term of the patent has not expired before an application is submitted under subsection (d)(1) for its extension;

(2) the term of the patent has never been extended under subsection (e)(1) of this section;

(3) an application for extension is submitted by the owner of record of the patent or its agent and in accordance with the requirements of paragraphs (1) through (4) of subsection (d);

(4) the product has been subject to a regulatory review period before its commercial marketing or use; [and]

(5)(A) ... the permission for the commercial marketing or use of the product after such regulatory review period is the first permitted commercial marketing or use of the product under the provision of law under which such regulatory review period occurred.

35 U.S.C. § 156(a). The parties do not dispute, and we find, that plaintiff's application satisfied the first four requirements. What is disputed is whether plaintiff's application satisfies the fifth requirement.

■ To resolve this dispute, we must examine the language of § 156. The Act defines "product," in relevant part, as a "drug product." *Id.* § 156(f)(1)(A). "Drug product," in turn, is defined as "the active ingredient of a new drug ... including any salt or ester of the active ingredient, as a single entity or in combination with another active ingredient." *Id.* § 156(f)(2). Plaintiff argues that the term "product" in § 156(a)(5)(A) means the combination of

the active ingredients hydrocodone bitartrate and ibuprofen. If plaintiff's interpretation of "product" is correct, the '252 patent is entitled to an extension of its term because this combination had not previously been marketed at the time plaintiff filed its application. Defendants argue, on the other hand, that because each of the two active ingredients in Vicoprofen had been commercially marketed in other drugs before being combined in Vicoprofen, the combination of these ingredients does not qualify as the first permitted commercial marketing or use of the product. For the reasons discussed below, we find that the USPTO correctly rejected plaintiff's argument that § 156(f)(2) allows for extension of a patent that claims a drug consisting of a combination of multiple active ingredients, each of which had previously been approved for commercial marketing and use. This decision is supported by the plain and unambiguous language of the statutory text and is consistent with both the broader structure of the Act and its legislative history.

### A. The Plain Meaning of § 156(f)(2)

To determine whether the USPTO's interpretation of § 156 properly reflects the intent of Congress in passing the Act, we first look to the specific text of the provision at issue. "When ... the terms of a statute [are] unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances." *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 395 (Fed.Cir. 1990) (quoting *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986)). Each party argues that § 156(f)(2) has a plain and unambiguous meaning that supports its position.

Plaintiff focuses its plain meaning argument on Congress's use of the definite article "the" in defining a drug product as "the active ingredient of a new drug." 35

U.S.C. § 156(f)(2). It argues that the use of "the" demonstrates Congress's intent to define "drug product" (and therefore, "product") as having only a single active ingredient, even where a drug is composed of multiple active ingredients. In such a drug, it continues, "the active ingredient" in effect means the combination of constituent active ingredients. Plaintiff also argues that this interpretation is consistent with § 156(f)(2)'s definition of "drug product" as "the active ingredient ... as a single entity or in combination with another active ingredient." *Id.*

Defendants argue that "the active ingredient" cannot mean a combination of active ingredients because that interpretation would render meaningless the portion of § 156(f)(2) that defines "drug product" to include "any salt or ester of the active ingredient," given that it is not chemically possible to have a "salt or ester" of a combination of active ingredients. *See In re Alcon Laboratories, Inc.*, 1989 WL 274404, 13 U.S.P.Q.2d at 1119 (reasoning that "there is no such thing as a salt or ester of two ingredients"). Plaintiff's interpretation of the statute would therefore render this part of the definition absurd, a result that Congress surely could not have intended. *See Glaxo Operations UK Ltd.*, 894 F.2d at 395 ("[T]he terms 'active ingredient,' 'salt,' and 'ester' had well-defined, ordinary, common meanings when Congress enacted the Act.").

We find that defendants' interpretation of § 156 is far more consistent with the language of that statute than is plaintiff's interpretation. Even though a drug may contain two or more active ingredients in combination with each other, for the purpose of patent extension that drug is defined through reference to only one of those active ingredients; the other active ingredient or ingredients are merely "in

combination" with this first active ingredient.

Therefore, the USPTO properly considered Vicoprofen to be a drug product defined either as "hydrocodone bitartrate ... in combination with another active ingredient" or as "ibuprofen ... in combination with another active ingredient," but not as "hydrocodone bitartrate and ibuprofen ... as a single entity." The statutory language is clear and unambiguous with regard to the meaning of the term "the active ingredient," and the USPTO's practice, of evaluating combination drugs through reference to the discrete active ingredients is completely consistent with the plain meaning of § 156(f)(2).

### B. The Statutory Scheme of § 156

■ Having found the USPTO's decision to be supported by the clear language of § 156(f)(2), we next consider whether defendants' interpretation of "the active ingredient" fits coherently within "the broader context of the statute as a whole." *International Business Machines Corp. v. United States*, 201 F.3d 1367, 1372 (Fed. Cir.2000) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). Plaintiff argues that defendants' interpretation is inconsistent with Congress's use of the term "product" in § 156(a), which requires that FDA approval of the product be that product's "first permitted commercial marketing or use." *Id.* § 156(a)(5)(A). Plaintiff contends that during its regulatory review of the "product," the FDA evaluates only the combination of a drug's ingredients and neither evaluates nor approves the individual active ingredients of that drug. Plaintiff maintains that defendants' practice of defining a combination drug through reference to any of its active ingredients is inconsistent with the realities of the FDA's practice, and could result in the USPTO granting a patent extension based upon an active ingredient of a combination even though that active ingredient, as a single entity, had never received FDA approval. This result would conflict with the requirement in § 156(a)(4) that the "product" had been subject to regulatory review before its commercial marketing or use.

■ Although plaintiff's argument makes some sense, the plain language of § 156 and the overall structure of the Act demonstrate that Congress was not concerned with the FDA's practice of approving an application for a combination drug by evaluating just the combination of active ingredients rather than each individual active ingredient. Whereas the FDA apparently evaluates combination drugs as a whole in determining their safety and efficacy, *see* 21 C.F.R. § 300.50, the Act permits patent term extension only with regard to "the active ingredient of [the] drug that receives FDA approval." *Hoechst–Roussel Pharmaceuticals, Inc. v. Lehman*, 109 F.3d 756, 759 n. 3 (Fed.Cir. 1997). The focus of the FDA approval process is the drug claimed by the patent as a whole, whereas the focus of § 156(a)(5)(A) is the "product," defined as "the active ingredient" of that drug, whether "as a single entity or in combination with another active ingredient." 35 U.S.C. § 156(f)(2); *Fisons plc v. Quigg*, 876 F.2d 99, 101 (Fed.Cir.1989) (holding that FDA approval of "the entire composition" of a drug is irrelevant to the meaning of "product" in § 156(a)(5)(A)).

■ The USPTO's policy of extending the patent term for combination drug patents only if one of that drug's active ingredients has not previously been approved by the FDA for commercial marketing and use is also consistent with what is not present in the Act, namely, protection for patents claiming new uses or dosage forms of previously approved drugs. Congress's

failure to include within the Act provisions to allow extensions for innovations such as new dosage forms and new delivery systems demonstrates its intent that "only new, pioneer chemical entities were to have their effective lives legislatively renewed." *Fisons plc v. Quigg,* 1988 WL 150851, 8 U.S.P.Q.2d 1491, 1499–1500 (D.D.C.1988), *aff'd,* 876 F.2d 99 (Fed.Cir. 1989).

Plaintiff does not dispute that hydrocodone bitartrate is responsible for the cough suppressant effect of Vicoprofen and ibuprofen is responsible for the drug's pain-relieving effect. In our view, this renders Vicoprofen quintessentially more akin to a new use or dosage form of hydrocodone bitartrate and ibuprofen than to some new active ingredient. Inapplicability of § 156 to patents covering the combination of two previously approved active ingredients complements the statute's inapplicability to patents covering new uses or dosage forms of such active ingredients.[3]

### C. The Legislative History of the Act

Having found that the plain meaning of § 156(f)(2) and the overall structure of the Act support defendants' position, we consider the Act's legislative history only to determine whether it contains a "clearly expressed legislative intention" contrary to that plain meaning. *Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 629 (Fed.Cir.1989). We find that plaintiff has not identified any unambiguous support in the legislative history for its position, much less the required "extraordinary showing" of a legislative intent contrary to the plain language of the statute. *Garcia*

*v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984).

The legislative history contains no direct evidence that Congress considered the issue of term extensions for patents claiming drugs that combined active ingredients all of which had previously been approved for commercial marketing and use. Although a passing reference to such combinations is found in a report submitted by the Congressional Office of Technology Assessment (the "OTA") to a House subcommittee in the Congress preceding the one that actually passed the Act, that report only undercuts plaintiff's argument, suggesting that combinations of existing ingredients were not a focus of this legislation:

> Although important pharmaceutical innovations may result from new therapeutic applications of existing chemicals, new processes for making chemicals, or new combinations or formulations of existing chemicals, this study concentrates primarily on innovations resulting from the discovery or synthesis of [new chemical entity drugs ("NCEs")].

Hearings on H.R.1937, H.R. 6444, and S. 255 Before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 97th Cong., 1st Sess. 99, 112 (1981). The same report justified its focus on new chemical entities by stating that research into these new entities was responsible for many pharmaceutical breakthroughs, that their development required more time, money, and risk than other types of innovation, and that they were disproportionately affected by FDA testing requirements. *Id.*

---

**3.** Although we are not unsympathetic with plaintiff's argument that defendants' interpretation of the Act creates a financial disincentive to pharmaceutical companies' development of new therapeutic drugs for consumers, whether plaintiff's interpretation of

§ 156(f)(2) would create a "better balanced policy" for applying the Act in parity with the FDA's discharge of its own statutory enforcement responsibilities is an issue appropriately addressed to Congress. *Glaxo Operations UK Ltd.,* 894 F.2d at 399–400.

Although not definitive, the legislative history supports the conclusion that, in enacting the Act, Congress considered and yet failed to include protection for combinations of existing chemicals as well as new dosage forms, new delivery systems, and creative formulations. *See* Fisons PLC, 1988 WL 150851, 8 U.S.P.Q.2d at 1497–1500 (outlining the legislative history with regard to criticisms of the Act's scope). Plaintiff has failed to establish that anything in the legislative history indicates a "clearly expressed legislative intention" contrary to the plain meaning of § 156(a)(5)(A) and (f)(2). *Madison Galleries, Ltd.*, 870 F.2d at 629.

*IV. Conclusion*

The USPTO's denial of term extension for the '252 patent was consistent with the USPTO's established policy concerning combination drug products. That policy, in turn, is consistent with both the plain meaning of the Act and Congress's intent in providing patent term extension only for a narrow class of drug products. We find, therefore, that the USPTO's decision to deny plaintiff's application for patent term extension under § 156(a) was neither arbitrary, capricious, an abuse of discretion, nor otherwise contrary to law. For these reasons, defendants' Motion for Summary Judgment will be granted and plaintiff's Cross–Motion for Summary Judgment will be denied by an Order issued with this Memorandum Opinion.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, defendants' Motion for Summary Judgment is GRANTED and plaintiff's Cross–Motion

for Summary Judgment is DENIED, and it is hereby

ORDERED that judgment be and is entered in favor of defendants.

The Clerk is directed to enter judgment in favor of defendants pursuant to Fed. R.Civ.P. 58, and to forward copies of this Order to counsel of record.